IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SAKINA MENGLE,

    Plaintiff,

  v.                                        Civil Action No. PX 15-610

SHADY GROVE ADVENTIST HOSPITAL,

    Defendant.

******

**MEMORANDUM OPINION**

Pending in this employment discrimination case is Defendant's motion for partial summary judgment (ECF No. 48). The issues are fully briefed and the Court now rules pursuant to Local Rule 105.6 because no hearing is necessary. For the reasons stated below, Defendant's motion is denied.

**I.    BACKGROUND**

On July 20, 2000, Sakina Mengle, an African-American woman, was hired by Shady Grove Adventist Hospital (hereinafter "Shady Grove" or "the Hospital") to work in the Hospital's Radiology Department. She was primarily employed as a front desk receptionist in the Department's diagnostic x-ray cost center and was responsible for greeting patients and checking them in. She also worked in the Radiology Department's "film library," filling in when the full-time film librarian, Jennifer Springer, took her half-hour lunch break. At the time she was terminated, Mengle held the position of Customer Service Representative II ("CSR II") earning $19.79 per hour and was qualified to work in multiple positions within the Department. *See, e.g.*, ECF No. 53-2 at 31. Mengle was supervised by Radiology Manager Alicia Lentini, who in turn

was supervised by Michael Calhoun, the Director of the Radiology Department. Calhoun reported to Eunmee Shim, the Hospital's Chief Operating Officer.

In 2013, Shady Grove was experiencing financial challenges that necessitated reductions in staffing. ECF No. 48-1 at 5. The Hospital engaged a consulting company, Kaufman Hall, to review its operations. As part of its review, Kaufman Hall determined that staffing should be reduced Hospital-wide. With respect to the Radiology Department's diagnostic x-ray cost center, Kaufman Hall concluded that staffing should be reduced by 4.87 full-time employee (FTE) equivalents,[1] resulting in a staffing goal of 32 FTEs for the cost center.

In the summer of 2013, Shady Grove's COO, Eunmee Shim, began discussions with Michael Calhoun on how Calhoun could meet this goal. Shim explained to Calhoun that based on her observations, the front desk appeared to be overstaffed. She also suggested that the need for a stand-alone film library had diminished with the increased digitalization of radiological records. *See* Shim Dep., ECF No. 54-1 at 11–12. Shim ultimately suggested to Calhoun that the film library function could be moved to the front desk, resulting in a merger of the film library's and front desk's staff. *Id.* at 12.

After closing the film library and merging the library tasks with those of the front desk, Calhoun concluded that one full-time front desk receptionist in the Diagnostic X-ray cost center, equal to one FTE, should be eliminated to meet the reduction goal of 4.87 FTEs. *See* Calhoun Dep., ECF No. 53-3 at 18–19. The remaining 3.87 FTEs would be eliminated through attrition, reducing the hours of some of the employees in the cost center, and not filling already-vacant positions. Calhoun Dep., ECF No. 53-3 at 15.

Mengle and two other full-time Customer Service Representatives—Nellie Abarca and Jennifer Springer—worked in the Diagnostic X-ray cost center. Jennifer Springer is an African-

---

[1] In other words, a full-time employee is equal to 1.0 FTE while a part-time employee equals less than 1.0 FTE.

American woman and like Mengle, is also a long-term, full-time employee classified as a CSR II. Prior to the merger of the film library and the front desk, Springer had never worked at the front desk. Nellie Abarca is a Hispanic woman and although she is also a customer service representative like Mengle and Springer, she was classified as a CSR I, earning $1.87 per hour less than Mengle and Springer.

Five other "on call" or "LPN" employees also provided front desk coverage—Mary Hennigan, Moneeb Al Angurli, Jeanne Kohn, Elaina Previte, and Lisa Aguilleria. Mary Hennigan, a white woman who worked at the front desk on a part-time basis, was a CSR II like Mengle and Springer. Moneeb Al Angurli, a white man, worked part-time at the front desk and in the film library as a CSR II. Jeanne Kohn, a white woman, also worked at the front desk in 2013 on an "on call" part-time basis. Elaina Previt, a white woman, carried the same responsibilities as Mengle. Previte's position was eliminated upon her resignation and as part of the Kaufman Hall recommended cutbacks. Lisa Aguilleria, an African-American woman, served as a Reception Coordinator and provided front desk coverage on the weekends. ECF No. 53-1 at 3.[2]

Calhoun concluded that the easiest and most efficient way to terminate one FTE was to fire one of the full-time employees. To be sure, he could have met his goal by eliminating several of the part-time positions, but he determined that such a move would cause gaps in front desk coverage and that firing several employees would be more difficult than firing one full-time employee. *See* Calhoun Dep., ECF No. 53-3 at 31. As explained above, Mengle, Springer, and Abarca were the diagnostic x-ray cost center's only full-time employees. Abarca was removed from consideration because she was classified as a CSR I and thus earned less money than

---

[2] While Ms. Aguilleria is mentioned in Ms. Lentini's declaration, she is not mentioned in by Mengle in her response in opposition to Shady Grove's partial motion for summary judgment.

Springer and Mengle. *Id.* at 32. Calhoun was therefore left to decide whether Mengle or Springer would be terminated.

Shady Grove's policy on reductions in force provides that the "primary factor for selecting employees within the affected job classification will be the employees' actual job performance." *See* Reduction in Workforce Policy, ECF No. 54-3. If performance is deemed equal, the employees' qualifications are to be examined. *Id.* Length of service is relevant only where both performance and qualifications stand in equipoise. *Id.* The policy further states that:

> Employee performance shall be determined by examining the employee's disciplinary actions, commendations and performance. Where performance appraisals are available, should an initial interview of the latest yearly performance appraisal establish that an employee who has been subjected to only a single appraisal is deemed more qualified, than an employee who has been employed within the department for three (3) or more years, then the last three (3) annual appraisal scores of the more senior employee shall be averaged and then compared to the employee with the higher review score from the latest appraisal.

*Id.*

Alicia Lentini, the Hospital's Radiology Manager and Calhoun's direct subordinate, compared Mengle's and Springer's performance evaluations for the calendar year 2011, the last year both employees received performance evaluations.[3] Both Mengle and Springer earned an "overall rating" of "successfully meets" expectations, which was recorded in the section entitled "Summary Performance." *See* ECF No. 53-1, Attachments B and C. However, the evaluations also contained numerous subcategories. In two of these subcategories, Mengle had received a lower score than Springer. Thus, based on her comparison of the evaluations, Lentini concluded that Springer had the superior evaluation and reported to Calhoun accordingly. Neither Lentini nor Calhoun considered Mengle's several commendations when deciding which employee to

---

[3] Lentini testified that she could not use Mengle's or Springer's performance evaluations for the 2012 calendar year because she had not completed them at the time the Hospital was deciding who to terminate. ECF No. 48-1 at 8.

terminate. In 2010, Mengle received the Star Award for her outstanding service to a patient in need.[4] *See* Mengle Dep., ECF No. 57-1 at 32–34; ECF No. 50-3. She also received several awards by her co-workers and an award for punctuality. ECF No. 50-3. According to Mengle, Springer had never received a commendation for her work performance.

Mengle believes that Shady Grove's failure to consider her many commendations in the termination decision was in violation of the Hospital's reduction in force policy, which explains that "[e]mployee performance *shall* be determined by examining the employee's disciplinary actions, *commendations* and work performance." *See* Reduction in Workforce Policy, ECF No. 54-3 (emphasis added). She also believes that had Calhoun properly followed the Hospital's policy, he would have considered all of the front desk employees when deciding who to terminate. Instead, he focused his decision on the two African-American CSR II employees who worked in the cost center. Pl.'s Response in Opp. to Def.'s Mot. Summ. J., ECF No. 50 at 9.

Contemporaneously, and on July 31, 2013, Mengle sent an email to Lentini reporting that she had been subjected to a racist joke by a co-worker, Wilton Hacket. ECF No. 48-1 at 9. After consulting with the Mary Cloutier, the Hospital's Human Resources Business Partner, Lentini and Calhoun presented Hacket with a final written warning. Lentini Decl., ECF No. 53-1 at 5.

Several days later, Calhoun and Lentini met with the Senior Human Resources Business Partner, Eric Brown, to review Mengle's performance evaluations. Brown agreed that the lower scores Mengle received in a few of the subcategories distinguished her evaluation from Springer's, and concluded that Shady Grove should eliminate Mengle's position even in the face of her recent complaint against Hacket. Mengle was informed of the termination decision on August 8, 2013 and her employment was terminated effective September 6, 2013.

---

[4] The parties dispute whether this award was given to one employee on a yearly basis or whether the award was analogous to an "employee of the month" award.

Mengle believes that the decision to terminate her was racially motivated and/or in retaliation for her filing a complaint regarding the incident with Hacket. She argues that the Kaufman Hall-driven staff cuts were used as a pretext for firing her. As evidence of the Hospital's racial animus, she alleges that on a few occasions Calhoun treated her with "open hostility" because of her race. Mengle Dep., ECF No. 57-1 at 22–23, 28–30; ECF No. 57-3 at 12–13. Additionally, Calhoun was once accused of racial or gender discrimination in anonymous letters from employees to the hospital, the seriousness of which caused hospital officials to meet with Calhoun in or around 2011. ECF No. 50-4 at 12–13; ECF No. 53-2 at 18.

On March 3, 2015, Mengle filed her first complaint against Shady Grove in this Court alleging racial and national origin discrimination as well as retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and the Montgomery County Human Rights Law, Montgomery Cnty. Code § 27-19. ECF No. 1. On October 30, 2015, she filed an amended complaint against Shady Grove for race discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981. ECF No. 25. On September 26, 2016, Shady Grove filed a motion partial for summary judgment as to Mengle's Title VII and § 1981 claims for racial discrimination. ECF No. 48. For the following reasons, Shady Grove's motion is denied.

## II. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure, permits a party to move for summary judgment or partial summary judgment by identifying "each claim or defense [ ] on which summary judgment is sought." Here, Shady Grove seeks summary judgment on Count One (race discrimination in violation pursuant to Title VII) and Count Two (race discrimination pursuant to § 1981) of Mengle's amended complaint. *See* ECF No. 48 at 1. A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled

to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). However, summary judgment is inappropriate if any material fact at issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). At the same time, the court must construe the facts presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

### III. ANALYSIS

Under Title VII it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000 e–2(a)(1). Like Title VII, 42 U.S.C. § 1981 prohibits "discrimination in employment on the basis of race." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551–52 (4th Cir. 2006). A plaintiff may survive summary judgment by establishing her Title VII or § 1981 discrimination claim either through direct and indirect evidence of discriminatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Diamond v.*

*Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). The Fourth Circuit has also referred to these two "avenues of proof" as the "mixed-motive" framework and the "pretext" framework, respectively. *But see Diamond*, 416 F.3d at 318 n.4 ("In the event that a plaintiff has direct evidence of discrimination or simply prefers to proceed without the benefit of the burden-shifting framework, she is under no obligation to make out a prima facie case."). Under either avenue of proof, the focus is on whether a reasonable juror could conclude that illegal discrimination was a motivating factor in the employment decision. *Sawicki v. Morgan State Univ.*, No. WMN-03-1600, 2005 WL 5351448, at *6 (D. Md. Aug. 2, 2005).

In this case, Mengle has not identified any direct evidence of discriminatory intent, and thus the *McDonnell Douglas* scheme of proof applies. *See Lightner v. City of Wilmington*, 545 F.3d 260, 263 n.* (4th Cir. 2008) ("[T]he *McDonnell Douglas* framework applies to discrimination claims under . . . § 1981."); *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (stating that "the *McDonnell Douglas* framework, developed for Title VII, has been used to evaluate race discrimination claims under the three statutes," i.e., Title VII, § 1981, and § 1983). *McDonnell Douglas* dictates a three-step analysis: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (internal citations omitted).

**A. Prima Facie Case**

In a discriminatory discharge case involving a reduction in force, the plaintiff establishes a prima facie case by showing (1) that she is a member of a protected class; (2) that she suffered from an adverse employment action; (3) that she was performing at a level that met her employer's legitimate expectations; and (4) that her duties were absorbed by employees not in the protected class or that the employer did not treat her protected characteristics neutrally when deciding to terminate her. *See Guessous*, 828 F.3d at 219 (4th Cir. 2016) (explaining that the typical prima facie case for employment discrimination must be altered in a reduction-in-force case to account for the particular factual circumstances); *see also Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991). Here, because some of Mengle's duties were absorbed by non-black employees, Shady Grove assumes, for the purpose of this motion, that Mengle has established a prima facie case of discrimination. *See* Def.'s Mot. Summ. J., ECF No. 48-1 at 12.

**B.     Legitimate Nondiscriminatory Reason**

Because Mengle has established her prima facie case, the *McDonnell Douglas* framework shifts the burden to Shady Grove to produce a legitimate, non-discriminatory reason for the adverse employment action. "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Instead, the defendant only needs to produce admissible evidence that raises a genuine issue of fact as to whether it discriminated against the plaintiff. *Id.*

At the summary judgment stage and construing all facts most favorably to the Plaintiff, Shady Grove has demonstrated a legitimate business reason for terminating Mengle. Plaintiff does not dispute that Shady Grove's financial challenges led to the Hospital hiring Kaufman Hall to determine how to reduce costs most effectively. Further, it is undisputed that Kaufman Hall

conducted a study and recommended staffing reductions throughout the hospital system, including Shady Grove. Particularly, the Kaufman Hall study recommended that Calhoun reduce staffing in the diagnostic x-ray cost center by 4.87 FTEs to 32 FTEs. *See* Def.'s Mot. Summ. J., ECF No. 48-1 at 14; Cost Reduction Plan Summary, ECF No. 54-2. Calhoun maintained discretion in determining how to implement the reduction of 4.87 full-time positions and ultimately believed the best course of action was to do so through attrition, by reducing employee hours, and by eliminating one full-time CSR II position. *See* Def.'s Mot. Summ. J., ECF No. 48-1 at 14; Calhoun Dep., ECF No. 53-3 at 18–19. He focused his decision on the CSR II employees because they earned a higher hourly wage than the CSR I employees. Therefore, firing a CSR II employee would reduce the Hospital's budget by a greater amount.

At the time the decision was made, Mengle and Springer were the only full-time CSR II employees in the diagnostic x-ray cost center. Lentini Declaration at ¶ 10, ECF No. 53-1 at 4. Once the decision was made to cut either Mengle or Springer, Lentini compared these employees' performance evaluations from 2011; the most recent calendar year that performance evaluations were completed for both employees. While the performance evaluations indicated that both employees successfully met their duties, there were several subcategories where Springer outperformed Mengle. Lentini concluded that Springer had the superior evaluation and reported this finding to Calhoun. Consequently, Calhoun decided to terminate Mengle. ECF No. 48-1 at 9. As such, Defendant has established a legitimate business reason for terminating Mengle.

**C.**     **Pretext**

After the defendant employer has proffered a legitimate reason for its termination decision, the burden shifts back to the employee to demonstrate that a genuine dispute of

material fact on the question of pretext exists sufficient to make the employer's proffered justification a triable issue. To prove pretext, the Plaintiff may "offer evidence that the facts supporting the defendant's articulated reasons are untrue," or that the "defendant's proffered reason, although factually supported, was not the actual reason for its decision . . . ." *Gbenoba v. Montgomery Cnty. Dep't. of Health and Human Servs.*, 209 F. Supp. 2d 572, 577 (D. Md. 2002) (citations omitted). *See also Gessous*, 838 F.3d at 217–18 (4th Cir. 2016) (citing *King v. Rumsfeld*, 328 F.3d 145, 154 (4th Cir. 2003) (explaining that to survive summary judgment on pretext, plaintiff "must cast sufficient doubt upon the genuineness of Defendant's explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing.")

Here, Mengle has generated a genuine question as to whether Shady Grove's non-discriminatory reason for firing her was false. Shady Grove put forward a single ground for terminating Mengle: the best way to accomplish the goals of the Kaufman Hall study was to terminate one full-time employee to arrive at the targeted 32 full time employees. The Cost Reduction Plan Summary Calhoun prepared for Kaufman Hall, however, reflects that terminating Mengle resulted in a final staffing plan of 29.44 FTEs, or 2.56 employee positions *under* the targeted staff reduction number of 32. *See* ECF No. 54-2. Put simply, Calhoun would have met the reduction target without terminating a single employee. Thus the Kaufman study could not be the reason for firing Mengle.

Calhoun was confronted with this discrepancy at his deposition:

Q. And am I right that by the end of the reduction in force, your final staffing plan was for 29.44 FTE's?
A. I'd have to confirm that. That's certainly what's stated here.
Q. Is there any reason to think that you go that wrong?
A. At this point, I'd say no.
Q. So the FTE variance to target, what do you understand that to mean?

11

> A. I'm assuming it's the variance between the final and the target.
> Q. So the 32 minus the 29.44?
> A. Right
> Q. How many FTE's did Sakina Mengle's job take?
> A. One.
> Q. So am I right that you could have met your target for the reduction in force without terminating Sakina Mengle?
> A. Yes.

Calhoun Dep., ECF No. 53-3 at 27. Certainly this, in combination with claims of Calhoun's discriminatory treatment of Mengle and others, is enough to cast his proffered legitimate business explanation in serious doubt.

In its reply brief, Shady Grove characterizes Mengle's argument that Calhoun reduced the cost center's staff to well below the 32 FTE target as "flatly wrong." ECF No. 51 at 2. It notes that later in Calhoun's deposition, he testified that he believed he only made reductions sufficient to meet his goal of 32 FTEs. *See* Calhoun Dep., ECF No. 53-4 at 30. Calhoun also stated that, to answer this question, he would have to research why the document at issue referred to a staffing plan of 29.44 FTEs. *Id.* Finally, "[t]o eliminate any further uncertainty concerning the issue," Shady Grove attached a declaration from Calhoun to its reply brief in which he confirms that, based on his further review of this issue, staffing was reduced to 32 FTEs. *See* ECF No. 51-1. Calhoun explains that the reference to 29.44 FTEs on the document at issue was an error resulting from his failure to include non-productive time (*e.g.* vacation and other non-working time) in his staffing plan when he completed the Kaufman Hall spreadsheet. *Id.* With the added non-productive time, Calhoun reduced the cost center's staff to a number just shy of 32 FTEs. Shady Grove, however, waited until its reply brief purportedly to correct the record and provides nothing other than Calhoun's after-the-fact declaration. Mengle, by contrast, has pointed to evidence in Shady Grove's exhibits supporting her interpretation. This is precisely the

kind of factual tit-for-tat that a fact finder must resolve. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, summary judgment is inappropriate here.

Notably, Plaintiff does not survive summary judgment simply because she has established sufficient evidence on her prima facie case and as to pretext. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) ("[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)) (internal quotation marks omitted). For instance, an employer would be entitled to judgment as a matter of law "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* However, proof that the proffered reasons were false may serve as circumstantial evidence of intentional discrimination. *Id.* The probative value of falsity varies depending on whether there are alternative non-discriminatory (but non-proffered) explanations and the strength of the evidence establishing falsity. *Id.* at 148; *see also Figueroa v. Geithner*, 711 F. Supp. 2d 562, 574 (D. Md. 2010). "Factors to consider in determining whether intentional discrimination could be found relying heavily on falsity and the prima facie case 'include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . .'" *Figueroa*, 711 F. Supp. 2d at 574 (quoting *Reeves*, 530 U.S. at 148–49).

Here, the alleged falsity of Shady Grove's proffered reason for firing Mengle is particularly probative because Shady Grove offered no other non-discriminatory reason for Mengle's termination. It is undisputed that Mengle's performance was never an issue and, but for the Kaufman Hall study, Shady Grove does not give any other reason to reduce its staff or

13

terminate Mengle. Therefore, when confronted with evidence that the Kaufman Hall study did not compel Mengle's termination, the jury may conclude that discrimination is the most likely alternative explanation for her firing. *See Reeves*, 530 U.S. 133, 147 ("[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.").

This is especially so when considering the additional evidence that, perhaps by itself would not be sufficient, but when coupled with the Shady Grove's failure to provide a non-discriminatory reason for firing Mengle, could sustain a finding of discrimination. That Shady Grove narrowed its termination decision to two African-American employees—Springer and Mengle—matters less if no legitimate business reason existed to terminate either employee in the first place. Additionally, Mengle has produced some evidence that, despite her exemplary work performance, she was treated adversely when compared to her non-black colleagues. Mengle testified that Calhoun treated her with open hostility: he screamed at her, criticized her for no apparent reason, insulted her in front of others, and often simply ignored her when she would ask a question. *See* Mengle Dep., ECF No. 57-1 at 22–23, 28–30. Mengle further observed that Calhoun did not treat the white and Hispanic employees in the Radiology Department in a similarly hostile fashion. Moreover, Calhoun was the subject of at least one complaint accusing him of discrimination. *See* Calhoun Dep., ECF No. 53-2 at 17–18. Based on this evidence in combination with no legitimate reason for firing her, a genuine issue of disputed material fact requires that Mengle's discrimination claims survive summary judgment.

14

## IV. CONCLUSION

In sum, when considering the evidence in the light most favorable to Mengle, she has generated sufficient evidence to establish a prima facie case of discrimination. Further, a genuine factual dispute exists as to whether Shady Grove's proffered reason for termination was pretextual. Defendant's motion for summary judgment is therefore denied. A separate order will follow.

4/17/2017
Date

/S/
Paula Xinis
United States District Judge